UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

GEORGE JONES, JR.                          :

                          Plaintiff,       :

 – against –                               :

CONSOLIDATED EDISON COMPANY OF NEW         :
YORK, INC.; METROPOLITAN LIFE INSURANCE    :
COMPANY; CONSOLIDATED EDISON COMPANY       :
OF NEW YORK, INC. LONG TERM DISABILITY     :
PLAN; CONSOLIDATED EDISON COMPANY OF       :
NEW YORK, INC. GROUP LIFE INSURANCE PLAN;  :
and CONSOLIDATED EDISON COMPANY OF NEW     :
YORK, INC. HEALTH CARE BENEFITS PROGRAM,   :

                          Defendants.      :
------------------------------------------------------X

Civil Action No.:

JUDGE CASTEL

COMPLAINT

**07 CV 3211**

APR 20 2007

U.S....

Plaintiff, George Jones, Jr., by his attorneys, BINDER & BINDER, PC, for his Complaint

against Defendants, Consolidated Edison Company of New York, Inc. ( "Con Ed"), Metropolitan

Life Insurance Company ("MetLife"), Consolidated Edison Company of New York, Inc. Long Term

Disability Plan (the "LTD Plan"), Consolidated Edison Company of New York, Inc. Group Life

Insurance Plan (the "Life Plan"), and Consolidated Edison Company of New York, Inc. Health Care

Benefits Program (the "Health Plan"), alleges as follows:


### JURISDICTION AND VENUE

1.      Jurisdiction of the Court is based upon 29 U.S.C. §§ 1132(e)(1) and 1132(f),

which give the District Courts jurisdiction to hear civil actions brought to recover benefits due under

the terms of an employee welfare benefit plan.  In addition, this action may be brought before this

Court pursuant to 28 U.S.C. § 1331, which gives the District Court jurisdiction over actions that

arise under the laws of the United States.

2.      Under the Employee Retirement Income Security Act of 1974 (hereinafter, "ERISA")

(29 U.S.C. §§ 1001, *et seq.*), the employee welfare benefit plans at issue in this litigation must

contain provisions for administrative or internal appeal of a denial of benefits.  Plaintiff has

exhausted all administrative avenues of appeal offered to him, and has deemed any further appeals

denied and/or futile, due to Defendants' violations of ERISA. Therefore, this matter is properly before this court for *de novo* judicial review under *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

3.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2), which allows an action under Title I of ERISA, as amended, to be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found.

## NATURE OF ACTION

4.     This is a claim seeking a declaration that Plaintiff is entitled to disability income benefits pursuant to the terms and conditions of an employee welfare benefit plan. This action also seeks a declaration that Plaintiff is entitled to continued life insurance and health care coverage, as well as to certain retroactive and future benefits, as a result of his disability. Lastly, Plaintiff seeks equitable relief pursuant to ERISA, in the form of an injunction preventing Defendant, Con Ed, from applying certain employment procedures to the detriment of Plan participants. Defendants, the LTD Plan, the Life Plan and the Health Plan, are sponsored and administered by Con Ed on behalf of Con Ed employees. As the Plan Defendants are employee benefit welfare plans established and maintained by an employer on behalf of its employees, ERISA applies to this action. Said coverages and benefits were effective at all times relevant hereto.

## THE PARTIES

5.     Plaintiff was born on March 11, 1961, is presently 46 years old, and is a resident of New York, New York.

6.     Defendant, Con Ed, is a New York corporation conducting the business of power distribution within the State of New York. Con Ed maintains its principal place of business at 4 Irving Place, New York, New York 10003. Con Ed is the named Sponsor and Plan Administrator for the LTD Plan, the Life Plan and the Health Plan.

7.     Defendant, MetLife, is a business entity licensed to conduct the business of insurance in the State of New York. MetLife maintains offices in New York State, located at One Madison

Avenue, New York, New York 10010. MetLife is the named Claims Administrator for the LTD Plan, the Life Plan and the Health Plan.

8.      Defendant, the LTD Plan, is an employee benefit welfare plan as defined by ERISA, and its terms and benefits are the subject matter of this action. The LTD Plan is sponsored and administered by Con Ed. Claims made pursuant to the LTD Plan are administered for Con Ed by MetLife, with Con Ed retaining the power to make the ultimate decision as to eligibility for benefits thereunder during at least the first twenty-four (24) months that LTD benefits are payable.

9.      Defendant, the Life Plan, is an employee benefit welfare plan as defined by ERISA, and its terms and benefits are the subject matter of this action. The Life Plan is sponsored and administered by Con Ed.

10.     Defendant, the Health Plan, is an employee benefit welfare plan as defined by ERISA, and its terms and benefits are the subject matter of this action. The Health Plan is sponsored and administered by Con Ed.

## STATEMENT OF FACTS

11.     Prior to and including November 20, 2003, Plaintiff was employed by Con Ed as a "Lead A Mechanic" for Con Ed's Gas Distribution Services Emergency Response Force. Plaintiff's duties included the installation of new business gas services and electrical ducts and response to emergency gas leaks, including monitoring and mitigation of same until conclusion.

12.     Plaintiff began working for Con Ed on or about February 19, 1991.

13.     For the period beginning prior to November 20, 2003, Plaintiff, together with other regular union employees of Con Ed, was covered as a participant under Defendant, the LTD Plan. The LTD Plan provides for payment of monthly benefits to participants of the LTD Plan who become "totally disabled" as defined by the LTD Plan. The monthly benefit is determined based on a set percentage of pre-disability eligible compensation.

14.     The LTD Plan provides in relevant part:

*For the purpose of determining your initial eligibility for LTD Plan benefits, **total disability** means you're unable to perform the duties of your job. This determination will be made by the Company during the first 24 months you're eligible to receive*

*LTD benefits*

*You're eligible to receive LTD benefits for 24 months based on the Company's determination of total disability following a waiting period. After 24 months, you're eligible for continued LTD Plan benefits only if you qualify for Social Security disability benefits (see "When Benefits Are Paid," page 25).*

The Summary Plan Description (the "SPD") for the LTD Plan at p. 17.

15.     In the SPD for the LTD Plan, the section entitled "When Benefits Are Paid" provides in relevant part:

*If you become totally disabled, you're eligible to receive LTD benefits on the later of two dates:*

- *after you use up your Company sick-pay benefits **or***
- *after 26 weeks*

***During the waiting period and the first 24 months benefits are payable,*** *Con Edison determines whether you are totally disabled and therefore eligible for benefits.*

*At any time during the first 24 months benefits are payable, Metropolitan Life may require proof that you continue to be disabled under the terms of the plan.*

***To continue receiving LTD Plan benefits after 24 months,*** *you must be disabled as determined under the Social Security Act and any applicable regulations – that is, you must qualify for Social Security disability benefits. At any time after you have received LTD Plan benefits for 24 months, Metropolitan Life may request certification that you continue to be disabled under the Social Security Act.*

The SPD for the LTD Plan at p. 20, emphasis in original.

16.     In or about 1996, Plaintiff injured his back on the job, while working for Con Ed. As a result of this injury, the New York State Workers' Compensation Board awarded Plaintiff benefits from the time of his injury in 1996, through November 20, 2003, and continuing thereafter.

17.     Beginning in 1996, Plaintiff regularly submitted medical documentation, and other information proving his continuing condition, to Con Ed, both directly, and through Con Ed's Worker's Compensation agent, Sedgewick Claims Management Service.   Plaintiff continued submitting such information through November 20, 2003, and thereafter.

18.     Due to the nature of Plaintiff's injury, his condition is both chronic and degenerative. As a result, Plaintiff's condition grew worse over time, as he continued to work for Con Ed.

19.     On or about April 11, 2003, Plaintiff underwent an MRI of his Lumbar spine, which indicated that he had a herniated disc at L4-L5, extending into the right neural foramen and

compressing the nerve root at that level and also that he had arthritis in his lower spine. These conditions cause Plaintiff severe and chronic pain and numbness in his lower back and have even required Plaintiff to use a cane for support when walking.

20.    On or about April 22, 2003, Plaintiff underwent further testing of his lower back and lower extremities, in the form of a Nerve Conduction Velocity Studies and an Electromyography. These tests confirmed the nerve dysfunction in Plaintiff's lower back and further revealed the radiation of pain and numbness to Plaintiff's buttocks and both lower extremities. Pursuant to these tests, Plaintiff was also diagnosed with bilateral lower lumbosacral radiculopathy.

21.    Due to these conditions, Plaintiff began having greater trouble performing the essential duties of his occupation for Con Ed as a Lead A Mechanic. Over the period of time from approximately April 2003 to November 20, 2003, Plaintiff attempted to continue working as best he could, but required increasingly frequent absences from work and on-the-job accommodation with less demanding physical requirements.

22.    Moreover, Plaintiff was required to rest frequently whenever and wherever he could during his workdays in order to relieve his constant lower back pain and weakness in his lower extremities.

23.    During this time period from approximately April 2003 to November 20, 2003, Plaintiff was being paid by the New York State Workers Compensation Board for injuries he sustained to his lower back while working for Con Edison. Throughout this period, Plaintiff regularly received treatment for his condition and was reimbursed for same according to the rules and regulations of the Workers Compensation Board.

24.    Most importantly, during this time period from approximately April 2003 to November 20, 2003, Plaintiff's treating physicians submitted forms – in addition to the Workers' Compensation forms – directly to Con Edison documenting Plaintiff's symptoms, continuing treatment and his need for on-the-job accommodation with less strenuous physical demands. These additional forms were provided to Plaintiff by Con Ed, were on Con Ed letterhead and were submitted directly to Con Ed's Medical Department.

25.    During the period from April 2003 to November 20, 2003, Plaintiff was, in fact, given

an on-the-job accommodation with less strenuous physical demands. Throughout this period, Plaintiff continued working in his regular occupation as a Lead A Mechanic, albeit in a modified capacity. This was due to the fact that Plaintiff's treating physicians were still clearing him to work on **restricted duty**, because, at that time, Plaintiff's physicians believed him to still be capable of performing his regular occupation, in light of the meaningful accommodation he was being given by Con Ed..

26.     By the end of 2003, it became obvious to Plaintiff, his treating physicians and even Con Ed's own Medical Department, that Plaintiff's condition had deteriorated to the point that he could not continue performing his own occupation as a Lead A Mechanic, notwithstanding the on-the-job accommodation and less physically demanding duties.

27.     Accordingly, on November 20, 2003, Plaintiff met with representatives of Con Ed to discuss the implementation of Con Ed's personnel procedure entitled "Placement and Training of Permanent Limited Duty Bargaining Unit Employees," dated December 21, 1987 (the "C-6 Policy").

28.     The purpose of this personnel procedure is outlined in the text of the C-6 Policy, which provides in relevant part:

> The Company will assign employees who cannot perform their regular duties due to the imposition of Permanent Medical Restrictions to some work function which the employee is capable of performing provided that such work is available, the employee is qualified and his/her work record has in all respects been satisfactory.

C-6 Policy at p. 1.

29.     The C-6 Policy contains the following definitions:

> Permanent Medical Restrictions: Limitations placed by the Medical Department on an employee's work activities which the Medical Department determines to be permanent.

> Permanent Limited Duty Employee: Any Regular or On-Trial employee who has one or more permanent medical restrictions or other impairment which precludes the employee from performing all or part of his/her regular work functions in a reasonable manner.

Id.

30.     The text of the C-6 Policy also sets forth the procedure to be followed, providing in relevant part:

PROCEDURE
A.    The Medical Department will notify the employee's department and the Central Placement Office immediately when Permanent Medical Restrictions are imposed on an employee.

B.    Within five (5) working days from receipt of the Medical Department notification, the employee's department and the local personnel office will make an individualized determination as to whether the imposed medical restrictions prevent the employee from performing his/her regular work functions in a reasonable manner. This individualized determination will be made with the advice and counsel of the Medical Department where necessary.

*          *          *

D.    If it is determined that the imposed medical restrictions prevent the employee from performing his/her work functions in a reasonable manner, that employee will be classified as a Permanent Limited Duty Employee.

*          *          *

I.    Six (6) months after the imposition of Permanent Medical Restrictions and the completion of appropriate training, the unplaced employee's organization will interview and inform the Permanent Limited Duty employee that because the employee is still unplaced, he/she will be terminated after being excused with pay for two weeks (ten working days).    The Permanent Limited Duty employee's organization will schedule an appointment to discuss benefits that may be due that Permanent Limited Duty employee as a terminating employee.

J.    During the two (2) week period after the interview described in Paragraph V.I, Personnel Operations will advise the Permanent Limited Duty employee of benefits available to him/her as a terminating employee.

K.    A Termination Notice will be prepared by the employee's organization in accordance with CPS 000-1.

1.    The reason for the employment termination will be... Released, Other Causes – No Work Available Within Restrictions. . . .

2.    The effective date of the termination will be two weeks after the interview described in Paragraph V.I.

Id. at pp. 1-5.

31.    After Plaintiff's meeting with Con Ed representatives, on November 20, 2003, Plaintiff had Permanent Medical Restrictions imposed upon him by Con Ed's Medical Department, and he was subsequently classified as a Permanent Limited Duty employee.

32.    Upon Plaintiff's classification as a Permanent Limited Duty employee, he was placed in several different **sedentary** positions with Con Edison throughout the New York area, during which time he received training for said positions – which mostly entailed training in typing and

other clerical duties.

33.    Despite the training he received in the various positions, Plaintiff was unable to perform the duties required for same, as Plaintiff lacked the education, training, experience, and transferable skills necessary to perform the regular duties of these positions.

34.    Plaintiff has a high school (trade school) education, and his past work experience is limited to that which he acquired during the approximately thirteen (13) years he worked as a CFR with Con Ed from August 28, 1972 to March 13, 1998.

35.    Con Ed was unable to place Plaintiff in alternate employment which he could perform under the existing Permanent Medical Restrictions imposed upon him by Con Ed's Medical Department, despite Plaintiff's sincere attempts to attend to his Limited Duty as directed.

36.    During the time he was on Limited Duty, however, Plaintiff's condition was rapidly deteriorating, and he was experiencing greater and more frequent pain and weakness in his lower back and legs.

37.    By February 2004, while still under the C-6 Policy, it became obvious to Plaintiff and his treating physicians that he would no longer be able to continue working even though he was performing only the totally sedentary duties required of him under the C-6 Policy. Plaintiff's chronic pain and weakness had just become too severe for him to undertake any sustained activity.

38.    Accordingly, Plaintiff's physicians submitted multiple disability forms directly to Con Ed's Medical Department documenting the fact that Plaintiff had severe medical restrictions and limitations which rendered him "**unable to return to work _in any capacity_.**"

39.    Plaintiff's physicians submitted these forms on various regular occasions throughout the period of February 2004 through April 2004 – all of these forms stating unequivocally that Plaintiff was "**unable to return to work _in any capacity_.**"

40.    Despite his doctors' clear advice to stop working – even under the Limited Duty of the C-6 Policy – Plaintiff continued to sincerely adhere to the retraining requirements of the C-6 Policy. However, on or about March 8, 2004, Plaintiff reported for C-6 duty and realized quickly that he would simply be unable to function at all that day.

41.    On March 8, 2004, Plaintiff informed his supervisor and the Con Ed Medical

Department that his medical condition had become too severe for him to continue working in any capacity, and he left work that day.

42.     On or about March 9, 2004, Plaintiff presented to his treating physician's office for examination, as well as to inform his doctor that, due to the exacerbation of his condition, he was finally taking the medical advice to stop working altogether.

43.     Based on the results of his examination, Plaintiff's treating physician – who had been regularly submitting disability forms directly to Con Ed – telephoned Con Ed's Medical Department on or about March 9, 2004, and explained that Plaintiff's medical condition had exacerbated to the point that he was unable to continue working, even under the C-6 Policy.

44.     Plaintiff has been unable to work in any capacity since March 8, 2004, and has not returned to work since that date.

45.     Due to his inability to continue working under even the severely limited duties required by the C-6 Policy, Plaintiff contacted MetLife on or about March 8, 2004, and requested claim forms to allow him to file for Long Term Disability benefits.

46.     Due to Plaintiff's inability to return to C-6 Limited Duty, Con Ed sent Plaintiff a letter, dated March 12, 2004, in which Con Ed stated that Plaintiff's sick allowance payments would end on May 13, 2004.

47.     Con Ed's letter further stated, in relevant part:

*If you are not able to return to work prior to the expiration of your sick allowance payments, please contact Employee Benefits at (212) 780-800 to schedule an appointment to discuss your health, insurance, and pension benefits. It is important that you schedule your appointment with the Benefits Department as soon as possible before your actual termination.*

***If you feel that*** *you will be medically capable of returning to work prior to the expiration of your sick allowance benefits, please contact your supervisor to schedule a medical appointment in the Company Occupational Health Department.* ***Approval to return to work must be granted by the Company Occupational Health Department prior to your return to duty.*** *Please note that this appointment must be scheduled prior to the expiration of your sick allowance benefits.* [Emphasis added.]

48.     It is obvious from the plain text of this letter that it was completely within Plaintiff's discretion whether he felt medically capable of returning to work.

49.     Moreover, it is obvious from the letter that, even if Plaintiff felt – in his discretion

– that he were capable of returning to work, he would still have to schedule, and submit to, an additional examination by Con Ed's Medical Department, who would then have to agree with the assessment that he was medically capable of returning to work, before Plaintiff would be allowed to resume working.

50.    Plaintiff never scheduled any such appointment with Con Ed's Medical Department because neither he, nor his doctors ever felt that he would be able to return to even Limited Duty work under the C-6 Policy.  In fact, Plaintiff's treating physicians had made it clear, through disability forms, and even through a direct telephone call to Con Ed's Medical Department on March 9, 2004, that Plaintiff was **"unable to return to work <u>in any capacity.</u>"**

51.    No appointment with Con Ed's Occupational Health Department (Medical Department) ever took place between March 8, 2004 (Plaintiff's last day worked), and May 13, 2004 (when Plaintiff's sick allowance payments expired).  Therefore, the prerequisites for Plaintiff to be cleared to return to duty were never fulfilled, and Plaintiff could not have been cleared to return to work according to Con Ed's own procedures.

52.    Notwithstanding the unfulfilled prerequisites for clearing Plaintiff to return to work, Con Ed sent a letter to Plaintiff, dated March 29, 2004, in which it stated that, pursuant to an examination of Plaintiff by Con Ed's Medical Department **on March 5, 2004 (prior to Plaintiff's last day of work on March 9, 2004)**, he had been cleared to return to Limited Duty under the C-6 Policy, and he would be terminated for insubordination and considered Absent Without Leave ("AWOL") as of March 31, 2004, if he did not report for duty.

53.    In addition to having been totally untimely, this supposed clearance for duty on March 5, 2004, did **not** address Plaintiff's ability to perform his regular occupation as a Lead A Mechanic. Rather, it only addressed Con Ed's opinion of his fitness to return to C-6 Limited Duty.

54.    On or about March 31, 2004, Plaintiff telephoned the Con Ed employee who had written the March 29, 2004 letter and explained in detail that his condition had exacerbated to the point that he and his doctors felt that he could not perform any kind of work – even with the considerably limited physical requirements under the C-6 Policy.

55.    Despite this telephone call and explanation, the same employee at Con Ed sent

Plaintiff an additional letter, dated April 9, 2004, which stated that Plaintiff was being terminated for insubordination and for being AWOL as of April 12, 2004 (even though Plaintiff's termination date was supposed to be May 14, 2004, according to Con Ed's letter of March 12, 2004).

56.     Because of Con Ed's premature and wrongful termination of Plaintiff's employment, Plaintiff was illegally deprived of over a month of sick pay.

57.     On or about April 12, 2004, Plaintiff submitted his LTD claim to MetLife, including various claim forms – in which his treating physician clearly stated that Plaintiff is unable to perform even a sedentary occupation – as well as supporting medical treatment documentation establishing Plaintiff's total disability.

58.     As of his employment termination date of April 12, 2004, Con Ed's Medical Department had **not** removed the Permanent Medical Restrictions that it had imposed upon him on or about November 20, 2003. In fact, no Department or employee of Con Ed has ever determined that Plaintiff is medically fit to return to his former job as Lead A Mechanic, nor was Plaintiff ever cleared to return to duty, as prescribed in Con Ed's letter of March 12, 2004.

59.     Plaintiff was improperly terminated under the C-6 Policy, and several of the procedures under that Policy were not followed during the period of time the Policy was applied to Plaintiff. Specifically, Plaintiff did not receive all the notifications required by the terms of the C-6 Policy, and Plaintiff was prematurely terminated under the C-6 Policy without even allowing him the benefit of the procedure listed in Con Ed's March 12, 2004, letter.

60.     Due to the incredibly arbitrary and capricious actions by Con Ed, including its wrongful termination of Plaintiff's employment and its exercise of complete control over MetLife, to the point that MetLife never even considered Plaintiff's valid LTD claim, Plaintiff deemed his LTD claim denied, so that this suit could be commenced.

61.     It is clear from Con Ed's actions, and from its total discretionary control over the operation of the LTD, Life and Health Plans, that any administrative appeal regarding Plaintiff's claims under these Plans would be futile.

62.     Moreover, Plaintiff and his treating physicians did, in fact, express their disagreement with Con Ed's determinations repeatedly, but these communications were ignored by Con Ed.

63.　　Additionally, Con Ed failed to even inform Plaintiff of his rights to LTD benefits, life insurance continuation or medical insurance continuation prior to, or even after, his termination by Con Ed on April 12, 2004.

### PLAINTIFF'S CAUSE OF ACTION
### FOR LONG TERM DISABILITY BENEFITS

64.　　Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "63" above, as if fully set forth herein.

65.　　After submitting his LTD claim to MetLife on or about April 12, 2004, Plaintiff received a letter from MetLife, dated April 20, 2004, which stated, **in its entirety**, the following:

> *This is in regard to your claim for Long-Term Disability Benefits.*
>
> *On March 25, 2004, an LTD package was sent to you. We received notification that you have been approved for duty on March 8, 2004 and we will be closing your file.*
>
> *If you have any questions, please contact our customer response center at 800-300-4296.*

66.　　This letter from MetLife did not, in any way, comply with the requirements of ERISA, in that it did not contain any reference to LTD Plan provisions, nor any mention of any appeal rights, nor even a decision denying LTD Plan benefits. MetLife's letter was simply a notification to Plaintiff that, pursuant to the arbitrary and capricious decision of Con Ed to approve him for duty, MetLife was refusing to even consider the claim.

67.　　Moreover, this letter demonstrated either a distinct lack of understanding of the terms of the LTD Plan as they relate to the C-6 Policy, or a purposeful plan by Con Ed and/or MetLife to simply refuse to consider valid LTD claims.

68.　　In either case, it is absolutely clear from the plain text of this letter that Con Ed was totally and completely in control of all decision-making under the LTD Plan – to the point that the only justification given by MetLife for refusing to consider Plaintiff's LTD claim was Con Ed's self-serving *ipse dixit*.

69.　　MetLife totally ignored the claim forms and other medical documentation submitted to it by Plaintiff's treating physicians – which all showed that Plaintiff was totally incapable of

performing even a sedentary occupation.

70.     In light of MetLife's sheepish refusal to even consider Plaintiff's LTD claim, and its total deference to Con Ed's wishes, it is clear that Con Ed is the party solely responsible for the arbitrary and capricious decision to ignore Plaintiff's valid LTD claim. Con Ed exercised an unconscionable degree of discretion over the LTD decision.

71.     However, as noted above, the LTD Plan specifically states that Con Ed retains the discretionary authority to make the determination regarding LTD claims for at least the first 24 months of benefits. Therefore, the determinations of Con Ed, itself, should bind it with regard to any decision made under the LTD Policy.

72.     This was not the case in Plaintiff's claim. In Plaintiff's claim, there is clear evidence of his inability to perform his own occupation, both from his treating physicians and from Con Ed's own Medical Department – which documented its agreement that Plaintiff was unable to perform the duties of his own occupation on November 20, 2003, when Plaintiff was placed on the C-6 Policy.

73.     Yet this clear evidence of Plaintiff's eligibility for LTD benefits was totally ignored by both Con Ed and MetLife.

74.     This total refusal by Con Ed and MetLife to even consider the specific medical determinations made by Con Ed, itself, as the named Plan Administrator for all the Plans at issue in this litigation, was arbitrary and capricious and in direct contravention of the plain terms of both the LTD Plan and the C-6 Policy.

75.     The C-6 Policy is incorporated into the LTD Plan by reference.

76.     Specifically, the LTD Plan provides in relevant part, with regard to **Limited Duty Termination**:

> *If you're terminated under the Con Edison Personnel Practice and Procedure entitled "Placement and Training of Permanent Limited Duty Bargaining Unit Employees," dated December 21, 1987 [i.e., the C-6 Policy], you're eligible to receive LTD benefits for 24 months after a 26-week waiting period.*
>
> *To continue to receive benefits after the initial 24-month period, you must be disabled as determined under the Social Security Act and any applicable regulations – that is, you must qualify for Social Security disability benefits. You must also meet the other requirements of the LTD Plan.*

The SPD for the LTD Plan at p. 21.

77.    It is clear from this LTD Plan provision that even Con Ed, at some point at least, had acknowledged the fact that the definition of "total disability" contained in the LTD Plan is identical to the language covering the placement of an employee under the C-6 Policy.

78.    The plain language of the LTD Plan, the C-6 Policy and Con Ed's own letters, of March 12, and March 29, 2004 (in which Con Ed made clear that it had only "cleared" Plaintiff for duty under the limited physical demands of the C-6 policy), should have led to a *pro forma* approval of his LTD claim and all other attendant employee benefits (such as life insurance and medical insurance continuation).

79.    However, as stated above, Con Ed and MetLife totally ignored this clear evidence mandating the approval of Plaintiff's LTD claim.

80.    As of November 20, 2003, Plaintiff was totally disabled under the terms of the LTD Plan, in that he was unable to perform the regular duties of his job as a Lead A Mechanic. Plaintiff remains totally disabled, as defined by the LTD Plan, to this date.

81.    Moreover, Con Ed's Medical Department never removed the Permanent Medical Restrictions that it had imposed upon Plaintiff, nor has any Department or employee of Con Ed determined that Plaintiff is medically fit to return to his former job as a Lead A Mechanic.

82.    Con Ed should have followed the clear dictates of the LTD Plan and the C-6 Policy, and should have accepted the determination of its own Medical Department -- which all mandated a finding of total disability and approval of his LTD claim.

83.    Defendants, Con Ed and MetLife, have wrongfully denied Plaintiff's benefits under the LTD Plan. Moreover, Defendants, Con Ed and MetLife, have acted arbitrarily and capriciously in denying Plaintiff's benefits under the LTD Plan.

84.    Plaintiff is, therefore, entitled to benefits under the LTD Plan from November 20, 2003, and continuing to the present, under the terms of the LTD Plan.

85.    Furthermore, Defendant, Con Ed, has violated its duties as Plan Administrator, as mandated by ERISA. Specifically, despite multiple written and oral requests by Plaintiff and his treating physicians, Con Ed has refused to afford Plaintiff a reasonable opportunity for a full and fair

review of his LTD claim.

## PLAINTIFF'S CAUSE OF ACTION FOR
## CONTINUED LIFE INSURANCE BENEFITS

86.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "85" above, as if fully set forth herein.

87.    For the period beginning prior to November 20, 2003, Plaintiff was covered as a participant under Defendant, the Life Plan. Con Ed and MetLife administer the Life Plan.

88.    The Life Plan provides, in relevant part, under the heading "**IF YOU BECOME DISABLED**":

> *Under the plan, **total disability** means you're unable to engage in any gainful occupation for which you're reasonably fitted by education, training or experience, as determined by Metropolitan Life.*
>
> *If you become totally disabled through either sickness or injury while you're insured under basic group life insurance – and you have exhausted your Company sick pay or receive benefits under the Company's Long-Term Disability Plan – Con Edison continues to provide basic group term life insurance coverage of $20,000 for you, as long as your disability continues.*

The SPD for the Life Plan at p. 8, emphasis in original.

89.    On April 12, 2004, Plaintiff's employment with Con Ed was wrongfully terminated, with his total disability being subsequently contested by Con Ed and MetLife. As a result of Con Ed's and MetLife's decisions with regard to Plaintiff's employment and LTD claim, Plaintiff was denied his opportunity for continued coverage under the Life Plan.

90.    The plain terms of the Life Plan make it obvious that continued coverage thereunder is, at least partially, contingent upon receipt of benefits under the LTD Plan.

91.    Due to his total disability, which commenced on November 20, 2003, Plaintiff is entitled to continued life insurance coverage within the terms of the Life Plan from November 20, 2003, to the present.

92.    Also, Plaintiff is entitled to reimbursement for any sums paid by him for the continuation or conversion of his life insurance coverage.

## PLAINTIFF'S CAUSE OF ACTION FOR
## CONTINUED MEDICAL INSURANCE BENEFITS

93.    Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "92" above, as if fully set forth herein.

94.    For the period beginning prior to November 20, 2003, Plaintiff was covered as a participant under Defendant, the Health Plan. Con Ed, MetLife and Empire Blue Cross administer the Health Plan.

95.    The Health Plan provides in relevant part:

If you or a covered dependant is totally disabled at the time your coverage ends, some hospital and medical benefits – not including dental, prescription drug, and vision care benefits – continue for a limited time for the disabled person only.

Total Disability is determined by the insurance company that insures the plan.

\*                             \*                             \*

Hospital benefits are provided only for *expenses incurred as a result of the condition causing total disability* – not for other expenses.

Medical benefits for the disabled person are provided for any illness if your coverage is provided by Metropolitan Life.

\*                             \*                             \*

Blue Cross hospital and Metropolitan Life medical benefits provided during disability end on the earliest of these dates:
— the date disability ends
— December 31 of the year following the year in which your coverage ends.

The SPD for the Health Plan at p 93, italics in original.

96.    On April 12, 2004, Plaintiff's employment with Con Ed was wrongfully terminated, with his total disability being subsequently contested by Con Ed and MetLife. As a result of Con Ed's and MetLife's decisions with regard to Plaintiff's employment and LTD claim, Plaintiff was denied his opportunity for continued coverage under the Health Plan.

97.    The plain terms of the Health Plan make it obvious that continued coverage thereunder is, at least partially, contingent upon receipt of benefits under the LTD Plan.

98.    Also, Plaintiff is entitled to reimbursement for any sums paid by him for the continuation of his medical insurance coverage or for expenses incurred for medical treatment, which would otherwise have been covered under the Health Plan.

**PLAINTIFF'S CAUSE OF ACTION FOR BREACH OF
FIDUCIARY DUTIES AGAINST DEFENDANT, CON EDISON**

99.     Plaintiff repeats and re-alleges the allegations contained in Paragraphs numbered "1" through "98" above, as if fully set forth herein.

100.    Under ERISA, fiduciaries have a statutory obligation to discharge their duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries.

101.    Fiduciaries also have a statutory obligation to discharge their duties with respect to the plan in accordance with the documents and instruments governing the plan.

102.    As listed above, Con Ed has repeatedly breached these fiduciary duties during its administration of this claim.

103.    First, on or about November 20, 2003, when Plaintiff was placed under the C-6 Policy, Con Ed failed to inform Plaintiff of his rights to LTD benefits, continuing life insurance coverage and continued medical insurance coverage that should have accrued on the same day that Plaintiff was placed under the C-6 Policy.

104.    Plaintiff, his treating physicians and even Con Ed's own Medical Department all agree that Plaintiff was rendered permanently incapable of performing his occupation as a Lead A Mechanic.

105.    By placing Plaintiff under the C-6 Policy, Con Ed determined that he was permanently unable to perform the regular duties of his job as Lead A Mechanic – which is the exact same criteria Plaintiff had to meet in order to qualify for LTD benefits – as of November 20, 2003. Therefore, Con Ed, as Plan Administrator, had an obligation to inform Plaintiff of his rights to LTD benefits, continued life insurance coverage and continued medical insurance coverage on the date he was placed under the C-6 Policy – or at the very latest, upon his termination on April 12, 2004.

106.    Instead, Plaintiff was not even given the option of applying for LTD benefits – as MetLife simply closed his LTD claim based solely upon Con Ed's self-serving statements that Plaintiff had been "cleared for duty." Moreover, Plaintiff was not even informed of his rights to continued life insurance and medical insurance coverage.

107.    Second, in placing Plaintiff under the C-6 Policy on November 20, 2003, yet requiring him to continue working without informing him of his rights to LTD benefits, Con Ed violated the clear terms of the LTD Plan.

108.    The definition of "total disability" found in the LTD Plan contains language that is identical to the portions of the C-6 Policy defining the term "Permanent Limited Duty Employee." Essentially, if an employee meets the definition of a Permanent Limited Duty Employee under the C-6 Policy, he also, *de facto*, qualifies for benefits under the LTD Plan pursuant to the plain terms of the LTD Plan and the C-6 Policy.

109.    Con Ed, however, did not grant Plaintiff LTD benefits, nor did Con Ed even allow MetLife to perform its ostensible duties as claims administrator under the LTD Plan. Con Ed prevented Plaintiff's LTD claim from even being considered. Consequently, Con Ed violated its fiduciary duties as Plan Administrator by applying the C-6 Policy to Plaintiff and requiring him to work without even giving him the option of applying for LTD benefits.

110.    By its actions, Con Ed had deprived Plaintiff of his right to benefits under the LTD Plan, the Life Plan and the Health Plan.

111.    Upon information and belief, Con Ed continues to apply the C-6 Policy in the same manner as it applied said policy in the instant claim. To wit, Con Ed continues to deprive LTD Plan participants of their rights under the LTD Plan by requiring said participants to participate in the C-6 Policy despite their concurrent eligibility for LTD benefits.

112.    Upon further information and belief, many Plan Participants are subject to termination by Con Ed and subsequent denial of their LTD claims, despite being placed on the C-6 Policy, and notwithstanding their obvious *de facto* qualification for LTD benefits under the plain terms of the LTD Plan and the C-6 Policy.

113.    Accordingly, this Court must declare that Con Ed's placement of an LTD Plan Participant under the C-6 Policy entitles said Participant to immediate eligibility under the LTD Plan, and that said Participant would have the immediate right to apply for LTD.

114.    In the alternative, this Court must issue an injunction permanently preventing Con Ed from applying the C-6 Policy to any LTD Plan Participant until such time as Con Ed can re-

negotiate the C-6 Policy with Local 1-2, Utility Workers Union of America, AFL-CIO, to make it compatible with the LTD Plan.

115.    Third, Con Ed violated its fiduciary duties by failing to initially award benefits to Plaintiff under the LTD Plan after Plaintiff's termination on April 12, 2004. As stated *supra*, the LTD Plan contains a specific provision requiring the granting of initial benefits under the LTD Plan for employees terminated under the C-6 Policy.

116.    With full knowledge that Plaintiff had been under the C-6 Policy, and with full knowledge that he had been terminated thereunder, Con Ed nonetheless failed to grant Plaintiff an initial 24-month award of LTD benefits as mandated by the LTD Plan.

117.    Moreover, Con Ed failed to initially grant benefits despite the fact that it had specifically retained the exclusive authority to make all eligibility determinations under the LTD Plan during at least the first 24-month period. Consequently, Con Ed has violated its fiduciary duties as Plan Administrator by administering the LTD Plan in direct contravention of its plain terms.

118.    Fourth, Con Ed, as Plan Administrator, violated its fiduciary duties when it failed to intervene on Plaintiff's behalf after Plaintiff's claim was closed by MetLife. As stated above, Con Ed failed to inform MetLife that the doctors in the Medical Department had determined, pursuant to the C-6 Policy, that Plaintiff was unable to perform the regular duties of his occupation.

119.    Moreover, as stated above, Plaintiff and his treating physicians continued to provide Con Ed with documentation proving his continuing inability to perform his own, or any, occupation throughout the months of April and May 2004, and continuing thereafter. Con Ed ignored this proof of disability, as it had ignored the effect of its C-6 determination on Plaintiff's LTD claim.

120.    As a result of its breach of its fiduciary duties as Plan Administrator of the LTD Plan, Con Ed has also breached its fiduciary duties as Plan Administrator under the other employee welfare benefit plans that it administers on behalf of its employees. Since continuation of these benefits was contingent upon Plaintiff's total disability, Con Ed's wrongful failure to recognize such total disability also prevented Plaintiff from exercising his rights under the other Employee Benefit Plans.

WHEREFORE, Plaintiff respectfully requests the following relief:

A.     That the Court determine and declare that, under the terms of the LTD Plan, Plaintiff's disability began on or about November 20, 2003, and that he continues to be disabled within the provisions of the LTD Plan;

B.     That, after making such a determination, the Court order Defendant, the LTD Plan, to compensate Plaintiff for his disability in accordance with the terms of the LTD Plan;

C.     That, after making a determination as to Plaintiff's disability, the Court further determine and declare that life insurance coverage be continued under the terms of the Life Plan, and that Plaintiff is entitled to reimbursement for any sums paid by him for the continuation or conversion of his life insurance coverage;

D.     That, after making such determination, the Court order Defendant, the Life Plan, to compensate Plaintiff for any sums paid by him, for which he was not liable pursuant to the terms of the Life Plan;

E.     That, after making a determination as to Plaintiff's disability, the Court further determine and declare that medical insurance coverage be continued under the terms of the Health Plan, and that Plaintiff is entitled to reimbursement for any sums paid by him for the continuation of his medical insurance coverage or for expenses incurred for medical treatment, which would otherwise have been covered under the Health Plan;

F.     That, after making such determination, the Court order Defendant, the Health Plan, to compensate Plaintiff for any sums paid by him for the continuation of his medical insurance coverage or for expenses incurred for medical treatment, which would otherwise have been covered under the Health Plan;

G.     That the Court determine and declare that, Defendant, Con Ed has breached its fiduciary duties with respect to its administration of the LTD Plan;

H.     That the Court determine and declare that the C-6 Policy, as currently written and applied by Con Ed, is incompatible with the terms and conditions of the LTD Plan;

I.     That the Court determine and declare that the current application of the C-6 Policy by Con Ed deprives LTD Plan participants of their benefits under the LTD Plan;

J.      That the Court enjoin Con Ed from applying the C-6 Policy, as currently written, since said procedure violates the clear terms of the LTD Plan;

K.      That the Court determine and declare that Plaintiff's classification as a "Permanent Limited Duty Employee" is tantamount to an initial determination of "total disability" under the terms and conditions of the LTD Plan;

L.      That the Court Order Defendants to reimburse Plaintiff for any expenses he incurred as a result of the termination of his employment with Con Ed, including without limitation, any retirement service credits, insurance premiums, co-payments or any other out-of-pocket expenses, which would otherwise have been satisfied through benefits from the Plans;

M.      That the Court award Plaintiff his attorney's fees pursuant to 29 U.S.C. § 1132(g); and

N.      That Plaintiff receive such other necessary and proper relief, including interest, costs and disbursements, to which he may be entitled.

Dated: April 19, 2007
       Hauppauge, NY

                                                    BINDER & BINDER, PC

                                          By:       _____
                                                    Patrick H. Busse, Esq. (PHB 1708)
                                                    Attorneys for Plaintiff
                                                    3000 Rabro Drive
                                                    Suite 101
                                                    Hauppauge, New York 11788
                                                    Telephone: (631) 582-1200
                                                    Facsimile: (631) 582-1228